## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TERRANCE LEWIS** :<br><br>Plaintiff :<br><br>v. :<br><br>**CITY OF PHILADELPHIA,** and :<br>**DETECTIVES JAMES HUGHES** and :<br>**THOMAS KANE,** in their individual :<br>capacities :<br><br>Defendants : | Civil Action No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Terrance Lewis, by and through his attorneys, Robert Ross, Esquire and Kevin Harden, Jr., Esquire of Ross Feller Casey, LLP, hereby allege the following:

### INTRODUCTION

1.     On May 24, 1999, Terrance Lewis was sentenced to life in prison without the possibility of parole after a Philadelphia jury found him guilty of the August 7, 1996 felony murder of Hulon Bernard Howard.

2.     Mr. Lewis spent 21 years, 5 months and 5 days wrongfully incarcerated before being exonerated by the Conviction Integrity Unit of the Philadelphia District Attorney's Office and being awarded a new trial by the Honorable Barbara McDermott of the Court of Common Pleas of Philadelphia County. The District Attorney moved to *nolle prosse* the charges and the trial court granted its motion, dismissing the charges against Mr. Lewis.

3.      Mr. Lewis' wrongful incarceration was the direct result of egregious misconduct by the Defendant Detectives, who at the time, were employees of the Philadelphia Police Department and the defendant City of Philadelphia. Specifically, in order to make their case against Mr. Lewis, the Defendant Detectives improperly used their power and positions to coerce witnesses into making false statements and identifications, and to offer sworn testimony that they knew to be false but that was consistent with the Defendant Detectives' theory of the crime. The Defendant Detectives also withheld exculpatory evidence that would have demonstrated Mr. Lewis' innocence and deliberately disregarded information and evidence that would have demonstrated flaws in the case against him, thereby causing Mr. Lewis to spend more than 21 years wrongfully incarcerated for a murder that he did not commit.

4.      Further, as detailed below, Mr. Lewis' wrongful conviction was the direct result of the unconstitutional and otherwise improper policies, practices and customs of the Philadelphia Police Department, including its Homicide Unit, which for a period starting as early as the 1970's and continuing through this investigation, and for years thereafter, evidences deliberate indifference by defendant City of Philadelphia to practices of egregious police misconduct, including but not limited to the coercion and suggestion of false statements by witnesses, coercing false identifications through the use of constitutionally defective identification procedures, witness intimidation, the suppression of inconsistent and exculpatory evidence, and abuse of authority.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. §1983 and 28 U.S.C. §§1331, 1343(a)(3), 1343(a)(4) and 1367(a).

6.      Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(a) in that the Defendants are subject to personal jurisdiction within the Eastern District of

Pennsylvania and the events that gave rise to this action occurred within the Eastern District of Pennsylvania.

7.     The matter in controversy exceeds Seventy-Five Thousand ($150,000) Dollars.

## JURY DEMAND

8.     Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

9.     Plaintiff, Terrance Lewis, is and at all times relevant to this Complaint, was a resident of the State of Pennsylvania. On the date of the crime, August 6, 1996, Mr. Lewis was 17-years-old. He was arrested on December 20, 1997, shortly after his 19th birthday. Mr. Lewis was discharged from the Pennsylvania Department of Correction on May 22, 2019, one day after his exoneration. Mr. Lewis currently resides in Philadelphia, Pennsylvania.

10.     Defendant, City of Philadelphia, is, and at all times relevant to this Complaint was, a municipality in the Commonwealth of Pennsylvania and was, at all times relevant to this Complaint, officially responsible for the policies, practices and customs of the Philadelphia Police Department and was the employer of the Defendant Detectives, Hughes and Kane.

11.     Defendant Hughes, was at all relevant times to this Complaint, employed as an officer of the Philadelphia Police Department acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of defendant City of Philadelphia and the Philadelphia Police Department. Defendant Hughes is sued in his individual capacity. Defendant Hughes was assigned as a detective with the Homicide Unit at the time of the investigation that resulted in the wrongful conviction of Mr. Lewis.

12.     Defendant Kane, was at all relevant times to this Complaint, employed as an officer of the Philadelphia Police Department acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of defendant City of Philadelphia and the Philadelphia Police Department. Defendant Kane is sued in his individual capacity. Defendant Kane was assigned as a detective with the Homicide Unit at the time of the investigation that resulted in the wrongful conviction of Mr. Lewis.

13.     At all times relevant to this Complaint, the Defendants Kane and Hughes acted in concert and in conspiracy with one another in order to deprive Mr. Lewis of his constitutionally protected rights. The Defendant Detectives were each personally involved in the unconstitutional misconduct committed against Mr. Lewis as described in this Complaint.

## FACTUAL BACKGROUND

### The Night of the Murder

14.     Paragraphs 1 through 13 are hereby incorporated as if fully set forth here.

15.     On August 6, 1996, Jimel Lawson shot and killed Hulon Bernard Howard in Mr. Howard's home at 6120 Sansom Street, Philadelphia, Pennsylvania.

16.     Mr. Howard was a 58-year-old widower.

17.     Prior to the shooting, the Decedent was present in his home with three guests: his girlfriend, Lena Laws, Denise Williams and a man identified as Omar.

18.     The Decedent, Laws, Williams and Omar were at the Decedent's home to smoke crack-cocaine.

19.     Shortly after Laws began preparing the crack-cocaine, three young men entered the home. Two were armed.

20.    An argument took place concerning money owed by the Decedent to one of the young men.

21.    One of the three men shot Mr. Howard. He was pronounced dead at 11:23 p.m.

22.    On August 6, 1996, Police Officer Butts, Badge Number 7026, arrived at the scene. He recorded the results of his investigation in a police report.

23.    Officer Butts noted that the Decedent had been shot once above his waist line.

24.    Officer Butts noted that the only witness present at the scene was the Decedent's girlfriend, Lena Laws. He noted that two witnesses, Omar and Denise, were not on location.

25.    Officer Butts was only able to obtain a description of two of the offenders from Laws:

> #1:    brown-skin, thin, 5'5", 19-21 years old, armed with a Tec-9
>
> #2:
>
> #3:    light-skin, 5'5", shotgun

26.    Officer Butts also noted that all three men were bald-headed and that they escaped west on Sansom in either a tan or gold Monte Carlo with the tag in the window.

27.    Officer Taggart, Badge Number 1888, transported Lena Laws to the Homicide Unit at the Police Administration Building at 8th and Race, Philadelphia, Pennsylvania, for an interview with Homicide detectives.

28.    Officer Frank Hack, Badge Number 6308, provided a statement to the Homicide Unit describing his involvement in the investigation.

29.    Officer Hack was working with Officer Melvin Perkins when he responded to a radio call of a shooting at 6120 Sansom Street.

30.    Officer Hack observed the Decedent laying on his back in the kitchen of the residence. The Decedent's arm was "stretched above his head" and there was a "gunshot wound to the abdomen by the naval." Officer Hack also observed an "exit wound to his back."

31.    Officer Frank Sheridan, Badge Number 5759, provided a statement to the Homicide Unit describing his involvement in the investigation.

32.    Officer Sheridan responded to the scene after other units had arrived at the scene.

33.    Officer Sheridan noted that Officer Butts was doing paperwork and talking to witnesses.

34.    Officer Sheridan did not personally speak to any of the witnesses at the scene. He did hear Laws say that Omar and Denise were in the house and that there was an argument over money.

35.    Officer James Sloan, Badge Number 2377, provided a statement to the Homicide Unit describing his involvement in the investigation.

36.    Officer Sloan began his shift at midnight and was assigned to maintain the crime scene for Homicide investigators. He took over the crime scene from Officer Sheridan.

37.    Officer Sloan described a conversation with Stephen El, a 24-year-old male whose mother lived at 6118 Sansom Street, which is next door to the scene of the crime.

38.    Officer Sloan stated that Mr. El said that the scene was a drug house, that the Decedent was selling drugs for someone but used more than he sold, resulting in a debt. Mr. El explained that he had heard that a man had been looking for the Decedent. He described the man as 5'10", 150 pounds, medium complexion, bald head, beard and mustache.

39.     Mr. El stated that Laws, the Decedent's girlfriend, had an argument with the man he described the day before the murder. After the argument, the man he described was seen attempting to leave but he couldn't because his car would not start.

40.     Mr. El pointed out the man's car, which was still parked on the street, and Officer Sloan recorded the license plate number and the VIN number.

41.     Upon information and belief, the information concerning the car and the man described by Mr. El was deliberately disregarded or evidence from the investigation into this information was unconstitutionally suppressed or discarded by the investigators, including the Defendant Detectives. No scene was held and no investigation was made into the 5'10" man with a medium complexion that weighed 150 pounds and had a bald head, mustache, and beard.

42.     Officer John Taggart, Badge Number 1888, provided a statement to the Homicide Unit describing his involvement in the investigation.

43.     Police were already on the scene when Officer Taggart arrived.

44.     Officer Taggart spoke to several people in the area without discovering any information.

45.     A supervisor instructed Taggart to transport Lena Laws to the Homicide Unit at the Police Administration Building.

46.     Laws told Officer Taggart that another male named "Omar" was in the house when the shooting occurred but left before the police arrived.

47.     Laws told Officer Taggart that she thought the suspects escaped in a gold or tan Monte Carlo with the tag in the back window.

48.     During the transport to the Police Administration Building, Laws pointed out a car that she believed was the getaway car. Officer Taggart reported that the vehicle was a Gold

Chevrolet Celebrity with a license plate number of BAJ-3777. The license plate was in the rear window. Officer Taggart notified police dispatch and they sent an officer to guard the car.

49.    Laws told Officer Taggart that the shooter's name was Jamar and that Jamar had been to the house where the murder occurred before that night.

50.    Upon information and belief, the information concerning the Chevrolet Celebrity was deliberately disregarded or the evidence from the investigation into this information was unconstitutionally suppressed or discarded by the investigators, including the Defendant Detectives. No scene was held and no investigative information about the vehicle was ever made available to the prosecutor or defense.

51.    Officer Shaun Butts provided a statement to the Homicide Unit describing his involvement in the investigation.

52.    Officer Butts stated that Lena Laws told him that "Mellow" did the shooting.

53.    Officer Butts stated that Laws told him there were 3 males present. Mellow had the Tec-9.

54.    Officer Butts stated that Laws told him that the doorbell rang, the Decedent answered the door, and 3 males entered; Mellow and two other guys.

55.    Officer Butts stated that Laws told him that the Decedent and the 3 men had a brief conversation in the living room and they then entered the kitchen.

56.    Officer Butts stated that Laws told him one of the 3 men had a shotgun and he fired it in the kitchen.

57.    Officer Butts stated that Laws told him that the man without the gun went through everyone's pockets.

58.    Officer Butts stated that Laws told him that she thought everything was over because the 3 men were leaving when Mellow turned around and shot the Decedent in the stomach.

59.    Officer Butts stated that Laws told him that the three men left in a gold-colored car, maybe a Monte Carlo.

60.    Officer Butts stated that Laws told him that Omar and Denise were also present at the time of the shooting and that she doesn't know their last names or where they live.

61.    Officer Butts stated that Laws told him that the 3 men who were involved in the robbery/murder were about the same height – 5'6" to 5'9", thin build, bald, 19-21-years old.

62.    Officer Butts stated that Laws told him that Mellow is brown-skinned and the other two men were light-skinned.

63.    Officer Butts stated that Laws gave him Mellow's pager number on a white piece of paper.

64.    Upon information and belief, the information concerning Mellow's pager number was deliberately disregarded or the evidence from the investigation into this information was unconstitutionally suppressed or discarded by the investigators, including the Defendant Detectives. No information about the pager number was ever made available to the prosecutor or defense.

65.    Sergeant Mariano Maddella, Badge Number 489, provided a statement to the Homicide Unit describing his involvement in the investigation.

66.    Sergeant Maddella stated that Laws told him that she was in the kitchen area when the 3 men first entered the home.

67.    Sergeant Maddella stated that Laws told him one of the males fired a shot upward.

68.    Sergeant Maddella stated that Laws told him that the three males then robbed everyone and turned their pockets inside out.

69.    Sergeant Maddella stated that Laws told him that the male who fired the shot into the ceiling then shot the Decedent.

70.    Sergeant Maddella stated that Laws told him that the man who did the shooting was named Mello and that he lived on the 6100 Block of Walnut Street.

71.    Sergeant Maddella stated that Laws told him that the males ran out of the house.

72.    Sergeant Maddella stated that the only gun Laws mentioned was a shotgun.

73.    Sergeant Maddella noted that he didn't recover any evidence at the scene.

74.    Sergeant Maddella stated that Laws told him that there was a man named Omar and a woman named Denise in the home at the time of the robbery/murder.

75.    Sergeant Maddella could not recall Laws' name but he knew that she was present at the Homicide Unit and explained that she had a speech impediment.

76.    On August 7, 1996, at approximately 2:30 a.m., Defendant Detective James Hughes began recording his interview of Lena Laws.

77.    Upon information and belief, Lena Laws arrived at the Homicide Unit more than 2 hours prior to her statement.

78.    Upon information and belief, the statement recorded by the Defendant Detectives does not reflect the entirety of their conversation with Laws.

79.    Laws told defendant Hughes that she had last smoked crack-cocaine at 10:30 a.m., but that she was no longer under the influence.

80.    Laws stated that she was the Decedent's girlfriend and had lived with him for 4 years.

81.  Laws stated that she called the Decedent by his middle name, Bernard.

82.  Laws stated that the Decedent came home at approximately 10:30 p.m. with Denise and Omar.

83.  Laws stated that the four of them sat down in the breakfast room inside the residence.

84.  Laws stated that about 20 minutes after they sat down, the doorbell rang and 3 men entered.

85.  Laws identified the 3 men by name: Stink, J.R. and Mellow.

86.  Laws stated that the Decedent asked Mellow if he had crack cocaine for sale.

87.  Laws stated that Mellow got angry and asked the Decedent for monies owed from the Decedent's drug debts.

88.  Laws stated that Stink had some kind of sawed-off shotgun and he pulled something back on the gun and then fired it up in the air.

89.  Laws stated that J.R. started searching everyone.

90.  Laws stated that J.R. robbed her for $20 that belonged to Omar.

91.  Laws stated that J.R. and Stink then walked away toward the living room.

92.  Laws stated that Mellow asked the Decedent for the monies owed and the Decedent responded tomorrow.

93.  Laws stated that Mellow went like he was going to walk away but then he turned and shot Bernard in the stomach with a Tec-9.

94.  Laws stated that Mellow, Stink and J.R. ran out the house.

95.  Laws told Omar to stay with the Decedent and ran next door to get a telephone to call 911.

96.     Laws described J.R., Stink, and Mellow as guys who came to the house, had asked to sell drugs from the house and that one night, they sold cocaine from the house and the porch.

97.     Laws stated that she thought Mellow's name was Jamal because she had heard the voicemail greeting when she used the beeper number he provided to the Decedent. Laws said that the Decedent had told her that Mellow was from the area of Cedar Avenue.

98.     Laws described Mellow as a black male, 20-years-old, 5'5" to 5'6", thin-build, short hair, and described his jewelry and clothing.

99.     Laws described Stink as a black male, light-skinned, 18-years-old, 5'7" to 5'8", medium-build, short hair, and described his clothing.

100.    Laws described J.R. as a black male, medium complexion, 19-years-old, 5'3", thin-build, shaved head and described his clothing.

101.    Laws described Mellow's car as tannish-gold with a license plate in the back window.

102.    Laws provided Detective Hughes with information about Denise and Omar.

103.    Laws stated that Mellow had been by the Decedent's residence earlier in the day. Mellow was looking for the Decedent the Decedent owed him money. The Decedent wasn't home so Mellow took his color television from the upstairs of the home.

104.    Upon information and belief, the information concerning the stolen television was deliberately disregarded or the evidence from the investigation into its theft was unconstitutionally suppressed or discarded by the investigators, including the Defendant Detectives. No information about the television or an investigation into the upstairs of the home or the television's whereabouts was ever made available to the prosecutor or defense.

**The Crime Scene & Autopsy**

105.    Lab reports were inconclusive concerning blood found at the scene of the crime.

106.    An antenna was analyzed for the presence of lead residue.

107.    An autopsy was started on August 7, 1996 at 9:15 a.m. by Sajid Qaiser, M.D.

108.    Hulon Bernard Howard's cause of death was determined to be a gunshot wound to the back. The manner of death was ruled a homicide.

109.    The Medical Examiner's report indicates that the abdominal wound was an exit wound.

110.    The Medical Examiner's report indicates that there was an entrance wound on the back with an abrasion that was an imprint of the firearm's muzzle.

111.    The Medical Examiner's report indicates that the trajectory of the projectile that entered Decedent's body is slightly upwards and slightly forwards.

112.    The Medical Examiner's report indicates that the bullet entered the skin and the muscles of the back close to the left side of the lumbar vertebra.

113.    The Medical Examiner's report indicates that the exit wound is on the left side of the umbilicus in the anterior midline, 1 x .25 inches.

114.    The Medical Examiner's report indicates that there were 1.2 liters of clotted blood recovered from the abdominal cavity.

115.    The Medical Examiner's report indicates that no projectile or fragments from the murder weapon were recovered.

116.    The Medical Examiner's report was finalized on October 29, 1996.

117.    Decedent's death certificate listed "gunshot wound to the back" as the cause of death.

118.    Sajid Qaiser, M.D., signed Decedent's death certificate on August 13, 1996.

119.    On September 4, 1996, toxicologist Samuel Rosen, Ph.D., reported Decedent's toxicology as follows: 0.081 milligrams of cocaine per 100 milliliters of blood and 0.19 milligrams of benzoylecgonine per 100 milliliters of blood. Cocaine and cocaethylene were present in Decedent's urine.

120.    On August 7, 1996, defendant Detective Hughes prepared a report that described the crime scene.

121.    The August 7, 1996 report notes that the first floor of the home consists of 4 rooms: a living room, a dining room, a breakfast room and a kitchen. The kitchen is the room furthest from the entrance.

122.    The August 7, 1996 report notes that there is a bullet hole at waist-level on a mirror on the north wall of the breakfast room, which is the wall closest to the entrance and facing the kitchen and the Decedent.

123.    The August 7, 1996 report notes that a fired 9mm cartridge casing was recovered on the kitchen floor almost mid-room.

124.    The copper projectile that killed the Decedent was recovered from a glass shelf in the breakfast room that faced the kitchen.

125.    The Decedent was lying face-up between the breakfast room and the kitchen, with his feet facing toward the breakfast room. His shoulders and head were midway between the breakfast room and the kitchen.

126.    The Decedent's feet were next to an overturned chair in the breakfast room, which was partially under the table Laws stated she and the others were seated at when the robbery/murder occurred.

127.    The August 7, 1996 report indicated that the scene was processed by Police Officer Carl Sampson and CES Karen Auerwecke.

128.    There was no damage to the ceiling of the residence that would be expected or consistent with a shotgun being fired anywhere inside the first floor of the Decedent's home.

## The August 20, 1996 Activity Sheet & Handwritten Notes

129.    On August 20, 1996, defendant Detective Hughes authored an activity sheet outlining steps taken in the Defendant Detectives' investigation. This activity sheet was never provided to Mr. Lewis' trial counsel and was not a part of the prosecutor's file. It was, however, in the defendant detectives' file, which was made available to Mr. Lewis' counsel, for the first time, in 2017.

130.    The August 20, 1996 Activity Sheet indicates that Detective Hughes spoke to Laws, that Detectives Hughes and Buckley made efforts to identify and locate the witness "Denise," that they spoke to a friend of the Decedent by the name of John Parson who provided additional background on the men who were responsible for the robbery/murder, and that they spoke to the mother of "Denise" and were able to identify her as "Denise Williams." This activity sheet and the information it contains was never provided to Mr. Lewis' trial counsel and was not a part of the prosecutor's file. It was, however, in the defendant detectives' file, which was made available to Mr. Lewis' counsel, for the first time, in 2017.

131.    The Defendant Detectives' handwritten notes were also in their file. The handwritten notes correspond to the information contained in the typewritten August 20, 1996 Activity Sheet. These notes never provided to Mr. Lewis' trial counsel and was not a part of the prosecutor's file. It was, however, in the defendant detectives' file, which was made available to Mr. Lewis' counsel, for the first time, in 2017.

132.     The Defendant Detectives' handwritten notes initially correspond with the August 20, 1996 Activity Sheet. Laws provides information concerning the identity and location of the witness Denise.

133.     The Defendant Detectives' handwritten notes also document "Omar 60th + Walnut." These handwritten notes were not provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. Although these notes were in the Defendant Detectives' file, none of the information contained in these notes were provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. They were first made available to Mr. Lewis and his counsel in 2017.

134.     The Defendant Detectives' handwritten notes document "Denise Sista 61 + Locust / 60 + Market St." These handwritten notes were not provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. Although these notes were in the Defendant Detectives' file, none of the information contained in these notes were provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. They were first made available to Mr. Lewis and his counsel in 2017.

135.     The Defendant Detectives' handwritten notes document "Stink 18 Blue Car Stink goes by Hakim Sadel Muhammad 19 (House Arrest) – bracelet." These handwritten notes were not provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. Although these notes were in the Defendant Detectives' file, none of the information contained in these notes were provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. They were first made available to Mr. Lewis and his counsel in 2017.

136.     The Defendant Detectives' handwritten notes document ""J.R." – goes by Raheem Grey Cavalier Works out at Bally's." These handwritten notes were not provided to Mr. Lewis'

defense counsel and they were not a part of the prosecutor's file. Although these notes were in the Defendant Detectives' file, none of the information contained in these notes were provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. They were first made available to Mr. Lewis and his counsel in 2017.

137.    The Defendant Detectives' handwritten notes document "Not sure where Bernard got shot. Saw hole in stomach." These handwritten notes were not provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. Although these notes were in the Defendant Detectives' file, none of the information contained in these notes were provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. They were first made available to Mr. Lewis and his counsel in 2017.

138.    The defendant detectives' handwritten notes confirm the information contained in the August 20, 1996 Activity Sheet. It documents contact information for John Parson and that Parson was a "friend of Decedent," in his "late thirties" that he was from "61 + Walnut St." and that he "knows what was going on bought drugs off these guys Mark sold at 60 + Chestnut St. lived basement apartment – Stink sold out of this house." These handwritten notes were not provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. Although these notes were in the Defendant Detectives' file, none of the information contained in these notes were provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. They were first made available to Mr. Lewis and his counsel in 2017.

139.    Additional handwritten notes of the Defendant Detectives include the results of a record search for the name Lena Laws provided to them for "Stink." The results of this search were not provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. Although these notes were in the Defendant Detectives' file, none of the information contained in

these notes were provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. They were first made available to Mr. Lewis and his counsel in 2017.

140.   Additional handwritten notes of the Defendant Detectives identify the man Lena Laws identified as Stink by name as Hakim Muhammad and by description, including that he was wearing a house arrest bracelet, as "795883 Chris Brooks." This name, police identification number and suspect were not provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. Although these notes were in the Defendant Detectives' file, none of the information contained in these notes were provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. They were first made available to Mr. Lewis and his counsel in 2017.

141.   The handwritten notes of the defendant detectives document "arrest on 8-12-96" under the writing "795883 Chris Brooks." A record search of the Administrative Office of Pennsylvania Courts' Common Pleas Court Management System database documents a Chris Brooks with an alias of Hakeem Muhammad that was arrested 6 days after the murder of Hulon Bernard Howard on the charge of Carrying A Firearm Without A License. These notes, this suspect, and information concerning his arrest for illegal possession of firearm 6 days after the crime were not provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. Although these notes were in the Defendant Detectives' file, none of the information contained in these notes were provided to Mr. Lewis' defense counsel and they were not a part of the prosecutor's file. They were first made available to Mr. Lewis and his counsel in 2017.

142.   The Defendant Detectives intentionally and maliciously suppressed these statements from Lena Laws and the information they discerned from it, as recorded in the Defendant Detectives' handwritten notes, in an attempt to secure a conviction while completing

disregarding Mr. Lewis' constitutional rights, causing his wrongful conviction and more than 21 years of wrongful incarceration.

**Lena Laws 1995 Arrest**

143.    On March 2, 1995, Officer Sheridan, who would later be assigned to guard the scene of the murder in August 1996, arrested Lena Laws for aggravated assault and weapons offenses. Although this information was in the Defendant Detectives' file, none of this information was provided to Mr. Lewis' defense counsel and it was not a part of the prosecutor's file. This information and documents supporting it were first made available to Mr. Lewis and his counsel in 2017.

144.    In multiple reports, Officer Sheridan explains that Lena Laws was engaged in an altercation with a complainant at the 6120 Sansom Street address. During the altercation, Laws pulled out a revolver and the complainant knocked it away from her hand. Laws then ran down the hallway and pulled out a shotgun and turned in the direction of the complainant. The complainant wrestled the shotgun from Laws and knocked her to the ground.

145.    After a brief struggle, Laws was placed under arrest. The revolver was a .22 caliber starter pistol and the shotgun was a 12-guage but unloaded.

146.    A search of the Administrative Office of Pennsylvania Courts' Common Pleas Court Management System database contains no information related to Lena Laws arrest for aggravated assault and weapons offenses in March 1995.

147.    Upon information and belief, Defendant Detectives intentionally suppressed the records of Lena Laws arrest, which were in their possession, because they used the threat of arrest or re-arrest to coerce Laws into cooperating with their investigation, fabricating testimony and falsely identifying Terrance Lewis, and the production of the records of Laws' arrest would have

served as exculpatory impeachment material necessary to demonstrate Laws' familiarity with shotguns, which she denied at the trial that resulted in Mr. Lewis' wrongful conviction and more than 21 years of wrongful incarceration.

**The Overbrook High School Photo Array**

148.    On an unknown date, an unnamed source provided Mr. Lewis' name and address to the Defendant Detectives. The Defendant Detectives recorded this information on a handwritten note. They also recorded the name and telephone number of the Decedent's brother. Although this note was in the Defendant Detectives' file, none of the information contained in the note was provided to Mr. Lewis' defense counsel and it was not a part of the prosecutor's file. The note was first made available to Mr. Lewis and his counsel in 2017.

149.    Soon thereafter, the Defendant Detectives visited Overbrook High School in Philadelphia and retrieved the identification cards for 8 students. One of those students was Terrance Lewis.

150.    Prior to his arrest for the murder of the Decedent, Mr. Lewis had never been arrested.

151.    Because he had never been arrested, prior to his arrest for murder, Mr. Lewis did not have a mugshot for inclusion in a photo array.

152.    The Defendant Detectives intentionally compiled an unconstitutionally suggestive photo array that included children that did not match the description of Mr. Lewis.

153.    On March 17, 1997, the Defendant Detectives re-interviewed Lena Laws.

154.    The Defendant Detectives asked Laws if she was sure about the Decedent being shot in the stomach and, according to the Defendant Detectives' interview record, she stated that

she thought that was the case because she saw the wound in his stomach and Mellow was "like beside and a little behind when he shot him."

155.    Upon information and belief, Laws new version of events concerning where Mello was standing when he shot the Decedent was the product of the Defendant Detectives' unconstitutional misconduct. Specifically, the Defendant Detectives coerced Laws into fabricating a statement by feeding details known to the police and unknown to the witness and continued to coerce her into providing information they deemed helpful to their investigation by using the threat of arrest.

156.    On March 17, 1997, the Defendant Detectives showed Laws the unconstitutionally suggestive photo array that included Terrance Lewis. She identified Terrance Lewis as the man "Stink" that had the shotgun. She also stated to the Defendant Detectives that she was "absolutely sure."

157.    At no time during the investigation did the Defendant Detectives ask Laws about the suspect she previously identified by name and description as "Stink."

158.    In an activity sheet authored by defendant Hughes and dated October 10, 1996, Detective Hughes documents that he has located Denise Williams using information received from the Welfare Fraud Unit of the Pennsylvania Department of Public Welfare and Detective Bob Zavada of the Wilkes-Barre Police Department. Although this activity sheet was in the Defendant Detectives' file, none of the information contained in it were provided to Mr. Lewis' defense counsel and it was not a part of the prosecutor's file. The activity sheet was first made available to Mr. Lewis and his counsel in 2017.

159.    In the October 10, 1996 activity sheet, defendant Hughes indicates that he and Detective Gross went to 6016 Chestnut Street looking for a male named Mark who may know the

real name of Stink. Defendant Hughes documented that no one was home. Although the activity sheet was in the Defendant Detectives' file, none of the information contained in it was provided to Mr. Lewis' defense counsel and it was not a part of the prosecutor's file. The activity sheet was first made available to Mr. Lewis and his counsel in 2017.

160.    On April 10, 1997, the Defendant Detectives travelled to the Wilkes-Barre Police Department and interviewed Denise Williams.

161.    On April 10, 1997, in the statement recorded by the Defendant Detectives, Denise Williams contradicted significant portions of Lena Laws statement.

162.    According to the interview recorded by the Defendant Detectives, Denise Williams stated that Omar was not present when the Decedent was shot.

163.    According to the interview recorded by the Defendant Detectives, Denise Williams stated that a man named Sam was already present in the home with Laws when Denise and the Decedent arrived.

164.    According to the interview recorded by the Defendant Detectives, Denise saw the Decedent on the street after he had purchased crack-cocaine and he invited her over.

165.    According to the interview recorded by the Defendant Detectives, Denise, Laws, the Decedent and Sam went into the kitchen to smoke the crack-cocaine.

166.    According to the interview recorded by the Defendant Detectives, just prior to the 3 men arriving, Laws was busy cooking the crack-cocaine so it could be smoked.

167.    According to the interview recorded by the Defendant Detectives, Laws, Sam and the Decedent began smoking the crack cocaine and Denise was waiting for them to offer her some.

168.    At no time in her interview did Denise say that a shotgun was fired into the ceiling.

169.    According to Denise's interview, the shooter got behind the Decedent and shot him after an argument over money.

170.    According to Denise's interview, the 3 men got into a gray Chevrolet.

171.    Denise Williams was shown three photo arrays. She identified a total of 4 persons. In the unconstitutionally suggestive photo array intentionally compiled by the Defendant Detectives, Denise identified Terrance Lewis as the man with the shotgun.

**The Wrongful Conviction of Terrance Lewis**

172.    On July 14, 1997, defendant Hughes caused a warrant of arrest to be issued for Mr. Lewis.

173.    The affidavit of probable cause submitted by defendant Hughes in support of the application for the July 14, 1997 warrant was not a truthful affidavit because it cited fabricated and coerced statements, omitted mention of credible exculpatory and inconsistent witness statements and information, and failed to account for the intentional compilation of an unconstitutionally suggestive photo array.

174.    On May 7, 1999, the trial of Commonwealth v. Jimel Lawson, Jehmar Gladden and Terrance Lewis began in Philadelphia.

175.    The jury was a death penalty qualified jury because the Commonwealth of Pennsylvania sought the death penalty for the alleged shooter, Jimel Lawson. Terrance Lewis faced charges of Second-Degree Murder, Robbery, Conspiracy, and firearms charges.

176.    Terrance Lewis pleaded not guilty.

177.    Laws identified Mr. Lewis as one of the three men that was present in the home when the robbery/murder occurred. She testified that she knew Mr. Lewis by the nickname "Stink" and that the Decedent sold drugs for Mr. Lewis.

178.    Contrary to her prior statements, Laws testified that Mr. Lewis sold drugs out of the basement of the home.

179.    Contrary to her prior statements, Laws testified that she saw Mr. Lewis at the home frequently.

180.    Contrary to her prior statements, Laws testified that two men came looking for the Decedent in the early afternoon on the day of the murder. She testified that one of those men was the man who shot the Decedent. She testified that she didn't know the other man but that he held her at gunpoint while the man who would later shoot the Decedent, Mellow, stole the Decedent's color television. Laws testified that she did not report this to the police.

181.    Contrary to her prior statements, Laws testified that she was in the home with Omar when the Decedent arrived.

182.    Laws testified that she had smoked one bag of crack-cocaine before the Decedent came home.

183.    Laws testified that she still realized what was going on and what was happening despite her having smoked crack-cocaine.

184.    Laws testified that Mr. Lewis had a gun in his hand and that she didn't know what kind of gun it was because she "don't know one gun from another." She said it was a "sawed-off shotgun."

185.    Contrary to her prior statements, Laws testified that Mr. Lewis and the unarmed defendant went into the living room and the shooter, "Mellow," remained in the breakfast room talking with the Decedent.

186.    Contrary to her prior statements, Laws testified that Mr. Lewis and the unarmed defendant returned to the breakfast room and then she heard "this loud noise, sound like a gun went off, but it was [Mr. Lewis] racking the shotgun."

187.    Contrary to her prior statements, Laws testified that the shooter, Mellow, and the Decedent were standing side-by-side when the Decedent was shot.

188.    Contrary to the evidence provided to Mr. Lewis, Laws testified that she informed the Defendant Detectives of the presence of a gunman in her home in the early afternoon with "Mellow."

189.    Contrary to her prior statements, Laws testified that although she told the police that Mr. Lewis fired a shotgun into the air, he only racked the gun and because she "don't know much about guns," she thought he fired it because it sounded like a gun going off to her.

190.    Laws testified that she learned to use the term "racked" from an interview with the Defendant Detectives.

191.    Contrary to her prior statements, Laws testified Lewis sold drugs from Decedent's home 50 times, every day, over a period of months.

192.    Contrary to her prior statements and the evidence provided to Mr. Lewis, Laws testified that she explained to the Defendant Detectives that her initial statement was incorrect.

193.    Contrary to the evidence provided to Mr. Lewis, Laws testified that she had provided additional statements to Detectives Hughes and Kane. She testified that she provided Detectives Kane and Hughes with additional information about the crime and corrected errors in her previous statements.

194.    Following Ms. Laws' testimony, Mr. Lewis' trial attorney, Thomas W. Moore, Jr., Esquire, requested the statements that Laws' referenced in her testimony.

195.    Assistant District Attorney John Doyle responded that "There's no other statement. There are four statements. Counsel has them all."

196.    The Defendant Detectives intentionally suppressed, discarded or failed to record these additional statements and kept them from the Assistant District Attorney, including the statement where Laws identified someone that is not Terrance Lewis as "Stink."

197.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally suggestive photo array, and the suppression of exculpatory and inconsistent evidence, Mr. Lewis was not able to rebut Laws' testimony or the prosecutor's claims.

198.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally suggestive photo array, and the suppression of exculpatory and inconsistent evidence, Mr. Lewis was not able to rebut the prosecutor's claim that Laws "knew [him] well."

199.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally suggestive photo array, and the suppression of exculpatory and inconsistent evidence, Mr. Lewis was not able to rebut the prosecutor's and Laws' claim that Laws observed the shooting.

200.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally suggestive photo array, and the suppression of exculpatory and inconsistent evidence, Mr. Lewis was not able to rebut the prosecutor's claim that this was the "virtually perfect case."

201.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally

suggestive photo array, and the suppression of exculpatory and inconsistent evidence, Mr. Lewis was not able to rebut the prosecutor's and Laws' claim that Lewis sold drugs out of the home.

202.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally suggestive photo array, and the suppression of exculpatory and inconsistent evidence, Mr. Lewis was not able to rebut the prosecutor's and Laws' claim that she knew Lewis by the nickname "Stink."

203.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally suggestive photo array, and the suppression of exculpatory and inconsistent evidence, Mr. Lewis was not able to rebut the prosecutor's and Laws' claim that the intoxicating effects of crack-cocaine did not affect her ability to accurately recall the events of the night in question.

204.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally suggestive photo array, and the suppression of exculpatory and inconsistent evidence, Mr. Lewis was not able to rebut the prosecutor's and Laws' claim that she "don't know one gun from another."

205.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally suggestive photo array, and the suppression of exculpatory and inconsistent evidence, Mr. Lewis was not able to rebut the prosecutor's and Laws' inconsistent and incredible statements and testimony explaining her confusing Mr. Lewis' "racking" of the shotgun for him having fired the shotgun into the air inside the first floor of the residence.

206.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally suggestive photo array, and the suppression of exculpatory and inconsistent evidence, Mr. Lewis was not able to rebut the prosecutor's and Laws' claim that the shooter was standing side-by-side with the Decedent when the shot went off.

207.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally suggestive photo array, and the suppression of exculpatory and inconsistent evidence, Mr. Lewis was not able to rebut or effectively examine Laws' claim that she had provided information about a gunman accompanying "Mellow" to the home during the early afternoon incident involving a color-television.

208.    As a result of the Defendant Detectives' unconstitutional misconduct, including coercing and suggesting that Laws falsely claiming that she didn't think Mr. Lewis fired the shotgun, but that she instead meant that he "racked" the shotgun and sparks came out, Mr. Lewis was not able to demonstrate Laws lack of credibility to the jury.

209.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally suggestive photo array, and the suppression of exculpatory and inconsistent evidence, Mr. Lewis was not able to rebut or effectively examine Laws' claim that Mr. Lewis sold drugs from the Decedent's home 50 times, every day, over a period of months.

210.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally suggestive photo array, and the suppression of exculpatory and inconsistent evidence, Mr. Lewis

was not able to rebut or effectively examine Laws' claim that she explained to the Defendant Detectives that her initial statement was incorrect.

211.    As a result of the Defendant Detectives' unconstitutional misconduct, including the coercion and suggestion of false statements, the intentional compilation of an unconstitutionally suggestive photo array, and the suppression of exculpatory and inconsistent evidence, the Commonwealth of Pennsylvania, through the Philadelphia District Attorney's Office, prosecuted Mr. Lewis.

212.    On May 24, 1999, a Philadelphia jury convicted Mr. Lewis of Felony Murder, Robbery, and Criminal Conspiracy. Mr. Lewis was automatically sentenced to life without the possibility of parole.

213.    Despite their heavy involvement in this complicated investigation and prosecution, neither of the Defendant Detectives testified at Mr. Lewis' trial.

**A Federal Court Says Terrance Lewis is Innocent**

214.    Mr. Lewis' appeals to the Superior and Supreme Courts of Pennsylvania were not successful.

215.    In January 2002, Mr. Lewis filed a petition under the Pennsylvania Post-Conviction Relief Act. The PCRA Court appointed counsel, who filed an amended petition.

216.    The PCRA Court dismissed the petition on the merits and the appeal was unsuccessful.

217.    On September 2, 2005, Mr. Lewis filed a second PCRA petition. In support of that petition, Mr. Lewis attached a hand-written and signed statement authored by his co-defendant, Jehmar "J.R." Gladden, that asserted Mr. Lewis was not involved nor was he present at the time of the of the murder.

218.    While the second PRCA petition was pending, Mr. Lewis discovered additional information supporting his claims of innocence. A previously unidentified witness, Kizzi Baker, saw people leave the scene of the murder immediately after it happened and Mr. Lewis was not one of them.

219.    Mr. Lewis subsequently filed an amended PCRA petition including the information learned from Kizzi Baker and claiming his actual innocence.

220.    On September 21, 2016, the PCRA Court dismissed Mr. Lewis' petitions as untimely.

221.    Mr. Lewis appealed the PCRA's Court's decision but was not successful due to failure to comply with the Rules of Appellate Procedure.

222.    On September 12, 2005, Mr. Lewis filed a federal habeas petition under 28 U.S.C. § 2254.

223.    On April 29, 2009, the Habeas Court held an evidentiary hearing at which Kizzi Baker, Jehmar Gladden, Tanisha Thornton and Mr. Lewis testified concerning his claims of innocence.

224.    On June 22, 2010, the Habeas Court issued an opinion stating that it believed Mr. Lewis was innocent, and that in light of the new evidence Mr. Lewis presented, it was more likely than not that no reasonably juror would have convicted Mr. Lewis.

225.    Despite this, the Habeas Court did not grant relief and appeals to the United States Court of Appeals for the Third Circuit and the Supreme Court of the United States reiterated that the Habeas Court's finding of actual innocence did not excuse the state court procedural issues with Mr. Lewis' collateral appeals.

**The Conviction Integrity Unit Investigation**

226.    In 2012, the Supreme Court of the United States decided *Miller v. Alabama*. Mr. Lewis filed a PCRA petition asserting that because the murder he was wrongfully convicted of occurred when he was 17-years-old, his mandatory sentence of life without parole was unconstitutional.

227.    Contemporaneously, Mr. Lewis filed additional PCRA petitions asserting his innocence based on newly-discovered evidence, namely witnesses who asserted they saw who fled the scene of the murder and Mr. Lewis was not one of them.

228.    In 2016, the Supreme Court of the United States decided *Montgomery v. Louisiana*. Mr. Lewis filed an Amended PCRA petition asserting that his life sentence was unconstitutional.

229.    In 2017, the Philadelphia District Attorney's Office's Conviction Integrity Unit began reviewing Mr. Lewis' claims of actual innocence.

230.    On July 7, 2018, the Philadelphia Court of Common Pleas denied Mr. Lewis request to be sentenced prior to the adjudication of his innocence claims because court regulations required that juvenile lifers exhaust all actual innocence claims before they are resentenced pursuant to Montgomery v. Louisiana.

231.    On January 24, 2019, Mr. Lewis elected to withdraw his actual innocence claims and accept an offer of 20 years to life at a juvenile lifer resentencing given the high probability that he would remain incarcerated indeterminately if he continued seeking review of his innocence claims.

232.    Mr. Lewis' decision to withdraw his innocence claims devastated him.

233.    On March 25, 2019, the Resentencing Court refused to accept the agreed-upon sentence of 20 years. A full resentencing hearing was then scheduled.

234.    On May 21, 2019, based upon its review of submissions by Mr. Lewis' attorneys and the Youth Sentencing and Reentry Project, the Resentencing Court stated that the "case gave [it] pause and it looked like there were issues with [Mr. Lewis'] case."

235.    The Philadelphia District Attorney's Office, at the May 21, 2019 hearing, stated that "there were really grave concerns" about "whether or not Terrance Lewis was, in fact, guilty."

236.    The Philadelphia District Attorney's Office stated that it had "conducted a thorough review of Terrence Lewis' trial, appellate and postconviction proceedings in both state and federal court, as well as investigative records archived with the Philadelphia Police Department and the District Attorney's Office" and that it "had conducted new interviews with a number of witnesses."

237.    The Philadelphia District Attorney's Office stated that "[a]s a result of [its] internal investigation, the Conviction Integrity Unit has determined that there has, indeed, been a miscarriage of justice in that there is a strong likelihood that Mr. Lewis is actually innocent of the offense for which he was convicted."

238.    The Philadelphia District Attorney's Office stated that witnesses produced by Mr. Lewis in support of his actual innocence and others that weren't produced by Mr. Lewis were credible in that they provided information that exculpates Mr. Lewis.

239.    The Philadelphia District Attorney's Office stated that because its internal investigation disclosed the miscarriage of justice and that Mr. Lewis is likely innocent, the office was duty-bound to assist the Court in making an appropriate disposition in determining the validity of Mr. Lewis' conviction.

240.    On May 21, 2019, the Resentencing Court granted Mr. Lewis PCRA petition and granted him a new trial due to Mr. Lewis having been denied the due process of law due to cumulative errors.

241.   The Philadelphia District Attorney's Office moved to *nolle prosse* the charges against Mr. Lewis.

242.   The Resentencing Court granted the *nolle prosequi*, discharged Mr. Lewis and ordered him released from Pennsylvania Department of Corrections' custody.

243.   On May 22, 2019, Mr. Lewis' 21-year, five month and five day wrongful incarceration ended.

**Unabated Corruption in the Philadelphia Police Department's Homicide Unit**

244.   The Philadelphia Police Department's pattern and practice of unconstitutional misconduct in homicide investigations, including the coercion and suggestion of false statements from witnesses, coercing and suggesting false identifications of suspects through the use of unconstitutional identification procedures, and the suppression of exculpatory and inconsistent evidence dates back to at least the 1970's and continued beyond the timeframe that the Defendant Detectives investigated and prosecuted Mr. Lewis.

245.   From at least the 1970's, and continuing well beyond the timeframe that the Defendant Detectives investigated and prosecuted Mr. Lewis, the City of Philadelphia had in force and effect policies, practices and customs of unconstitutional misconduct in homicide investigations, including but not limited to using coercive techniques in interviews to obtain false and misleading statements from witnesses, fabricating inculpatory statements from witnesses and evidence, coercing and suggesting false identifications of suspects through the use of unconstitutional identification procedures, withholding exculpatory and inconsistent evidence, ignoring eyewitness interviews and fabricating incriminating statements from witnesses by feeding details about the crime to the witnesses.

246.    At the time of the investigation and prosecution of Mr. Lewis, the Philadelphia Police Department had a policy, practice or custom involving the use of various techniques to make false statements by witnesses appear true and reliable, including but not limited to: providing a witness with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication; taking misleading investigative steps to make statements appear more credible; selectively documenting witness statements and not the preceding interrogation, interview, preparation or rehearsal; selectively recording witness' interviews; and misrepresenting that a suspect's formal statement was a verbatim statement in the suspect own's words, even when paraphrased or altered.

247.    At the time of the investigation and prosecution of Mr. Lewis, the Philadelphia Police Department had a policy, practice or custom involving the use of various techniques to make false identifications appear true and reliable, including but not limited to: intentionally suggesting that the suspect was included in the array of photos; intentionally suggesting which suspect in the array of photos is the detective's preferred suspect; including a limited number of photos that match the suspect's description; using photos of different photo quality; confirming that the correct suspect was chosen; selectively documenting a witness' statements concerning the identification of a suspect; and producing entire photo arrays without suspects to bolster the witness' identification of suspect.

248.    At the time of the investigation and prosecution of Mr. Lewis, the Philadelphia Police Department had a policy, practice or custom involving the use of various techniques to coerce false statements, including but not limited to: subjecting witnesses to needlessly prolonged interrogations and interviews; isolation; making promises, regardless of their truthfulness; threatening charges for unrelated misconduct; offering assistance in unrelated criminal matters,

including pending or recently dismissed criminal charges; interviewing witnesses while they are under the influence of mind-altering narcotics that made them more susceptible to coercion and the drugs mind-altering effects; and asserting that the witness will benefit in some way from making a statement that assists the police, and they will suffer some sort of disadvantage if they do not assist.

249.    At the time of the investigation and prosecution of Mr. Lewis, the Philadelphia Police Department had a policy, practice or custom involving the use of various techniques to suppress or withhold exculpatory or inconsistent statement and evidence, in violation of their known duty under *Brady*, including but not limited to: making false statements to prosecutors about the existence of evidence; failing to provide complete Homicide files to prosecutors; coercing witnesses into keeping exculpatory and inconsistent information from prosecutors; refusing to testify at trial; discarding or deleting exculpatory and inconsistent information from Homicide files; ignoring exculpatory and inconsistent information so that there is no record to be deleted from Homicide files; farming out portions of Homicide investigations to police officers outside the Homicide Unit or other detectives assigned to the Homicide Unit so as to maintain a lack of evidence of their participation; and threatening witnesses in possession of exculpatory and inconsistent information to prevent them from coming forward to prosecutors or testifying.

250.    At the time of the investigation and prosecution of Mr. Lewis' case, the Philadelphia Police Department had a policy, practice or custom of detaining, arresting, threatening and interrogating purported witnesses in criminal investigations, without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions, or for material benefits. These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel.

251.    At the time of the investigation and prosecution of Mr. Lewis' case, the Philadelphia Police Department had a policy, practice or custom of maintaining a deliberately biased Internal Affairs Division that exonerated police officers and detectives, including Homicide Detectives, regardless of the evidence of misconduct.

252.    At the time of the investigation and prosecution of Mr. Lewis' case, the Philadelphia Police Department had a policy, practice or custom involving the intentional use of untruthful affidavits of probable cause to support arrest warrants that, in violation of their constitutional duties, failed to recite the totality of circumstances, including exculpatory information, and cited fabricated evidence, statements from coerced witnesses, omitted mention of credible exculpatory witness statements, and mischaracterized the nature of unconstitutional identifications. The City of Philadelphia failed to train and supervise its officers and detectives to deter or end this policy, practice and custom.

253.    These practices are well known to the City of Philadelphia and its policymakers with respect to criminal investigations and prosecutions as a result of newspaper investigations, including the Philadelphia Inquirer's Pulitzer Prize winning reporting in 1977-78, governmental investigations, including the Philadelphia Police Department's 39th District Corruption Scandal in the 1990's, complaints from the public, complaints from attorneys, complaints from whistleblowers, prior litigation, including employment complaints to the EEOC, and internal police investigations.

254.    The 39th District Corruption Scandal involved widespread unconstitutional practices that went unchecked despite widespread knowledge throughout the Philadelphia Police Department and the City of Philadelphia. The police misconduct in the 39th District Corruption Scandal included the fabrication of search and arrest warrants, the omission of material

information from search and arrest warrants, the concealment and suppression of exculpatory evidence, false allegations of criminal conduct, planting evidence on suspects, and physically abusive or coercive interrogations. The Philadelphia Police Department was deliberately indifferent to the officer's misconduct and credible complaints to the Police Department's internal compliance department were disregarded.

255.    Various cases involving the exoneration of individuals accused of murder, individuals yet to be exonerated, and individuals who were in fact guilty demonstrate that this misconduct was pervasive within the Philadelphia Police Department's Homicide Unit before and after it investigated Mr. Lewis, and, upon information and belief, the misconduct described in this Complaint was tacitly, if not expressly, permitted by, committed with, or deliberately ignored when committed in the presence of Homicide Unit and Philadelphia Police Department supervisors.

256.    In Commonwealth v. Raymond Carter, which was investigated from 1986 until his conviction in 1988, resulted in the exoneration of Mr. Carter after former police officer Thomas Ryan was indicted in February 1995 on federal corruption charges. A Philadelphia judge ordered a new trial because the prosecution's star witness had been paid $500 by then-officer Ryan to testify against Carter. The City of Philadelphia paid a "churchgoing grandmother" a significant settlement after she sued alleging Ryan helped frame her and send her to prison for 3 years. In 1996, the Philadelphia Inquirer reported that Officer Jack Baird, who was Ryan's partner, fabricated evidence because Ryan wanted the overtime compensation often available to officers in murder investigations.

257.    In Commonwealth v. Anthony Wright, which was investigated in 1991 and resulted in the exoneration of Mr. Wright after a period of wrongful incarceration, involved misconduct in

the Philadelphia Police Department's Homicide Unit that involved the fabrication and coercion of witness statements, the fabrication and planting of physical evidence, the garnering of false identifications based on suggestive and coercive police behavior, and the nondisclosure and suppression of exculpatory evidence.

258.    Commonwealth v. Messrs. Gilyard & Wells, which was investigated in August 1995 and resulted in the exoneration of the defendants after periods of wrongful incarceration, involved the fabrication and coercion of witness statements, garnering of false identifications based on suggestive police behavior, the suppression of exculpatory evidence and the submission of untruthful affidavits of probable cause when seeking arrest warrants.

259.    Other convictions that later resulted in exonerations and that demonstrate the rampant patterns, practices and customs of official misconduct within the Philadelphia Police Department and its Homicide Unit include:

a.  Commonwealth v. Donald Ray Adams (1992 wrongful conviction): Mr. Adams case was investigated beginning in 1990 until his conviction in 1992. Police ignored the physical description of the suspect provided by numerous eyewitnesses and instead opted to pressure and coerce an eyewitness with a crack cocaine addiction and criminal history. Mr. Adams' was granted a new trial and a jury returned a verdict of not guilty in 2011.

b.  Commonwealth v. Shaurn Thomas, Jr. (1994 wrongful conviction): Mr. Shaurn Thomas' case was investigated from 1990 until his conviction in 1994. It involves the fabrication of evidence, suppression of exculpatory information, and the coercion of witnesses facing criminal charges. A police homicide file was located that contained exculpatory statements and police reports that identified additional suspects and that rebutted key prosecution witnesses, all of which had never been turned over to Thomas' counsel.

c.  Commonwealth v. Clayton Thomas, Jr. (1994 wrongful conviction): The misconduct that occurred in Mr. Clayton Thomas' case mirror the facts of the Shaurn Thomas matter.

d.  Commonwealth v. Willie Veasy (1993 wrongful conviction): Mr. Veasy's case was investigated from 1990 until his conviction in 1993. This matter involves the fabrication of evidence, namely a statement, by way of physical coercion of the defendant. Mr. Veasy refutes that an inculpatory statement he provided was provided voluntarily and instead asserts that a member of the Philadelphia Police Department's Homicide Unit coerced his statement and that he coerced a witness

who is legally blind to provide false testimony against Mr. Veasy. According to Mr. Veasy's employer, he could not have committed the crime he is alleged to have committed because he was at work.

e. Commonwealth v. Jimmy Dennis (1992 wrongful conviction): Mr. Dennis' case was investigated from 1991 until he was sentenced to death in 1992. Nearly 25 years later, the United States Court of Appeals for the Third Circuit, sitting *en banc* vacated Mr. Dennis' conviction, holding that constitutional violations by Philadelphia Police Department Homicide detectives had undermined the fairness of Mr. Dennis' trial. Philadelphia Police Department Homicide detectives coerced witnesses, fabricated evidence, engaged in deliberate deception by concealing and suppressing material evidence, employed unlawful investigate techniques, presented false testimony, and denied Mr. Dennis due process of law and a fair trial.

f. Commonwealth v. Percy St. George (Prosecution Withdrawn 1994): Mr. St. George's case was investigated from 1993 until 1994. A Philadelphia Police Department Homicide Detective obtained a statement from a man who signed another person's name because of his fugitive status. As the trial approached, the Homicide Detective coerced the person whose named appeared in the signature to provide and sign a fabricated statement and to falsely identify Mr. St. George from an overly suggestive sham photo array. Upon further investigation, evidence suggested the homicide detectives coerced the witnesses into providing false statements and false identifications. The Detectives pleaded their Fifth Amendment right against self-incrimination rather than testify as to how they obtained the statements and identification.

260.    As a result of the pattern of police misconduct that was in effect at the time of the investigation of the homicide for which Mr. Lewis was charged, the United States District Court for the Eastern District of Pennsylvania entered a consent decree in the matter of NAACP v. City of Philadelphia requiring wide-ranging reforms in the Philadelphia Police Department and, in particular, providing for specific limitations on the investigative practices and policies of the Philadelphia Police Department.

261.    During the 1980's and 1990's, and concurrent with the time of the investigation of this case by the Philadelphia Police Department, there was within the Department a pattern, practice and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments. On 3 separate occasions in the

1980's, the United States District Court of Eastern District of Pennsylvania issued orders enjoining

the Philadelphia Police Department from engaging in these practices.

    a. Cliett v. City of Philadelphia (1985): consent decree arising out of "Operation Cold Turkey," which resulted in the unlawful arrest and detention of 1500 individuals in drug sweeps.

    b. Spring Garden Neighbors v. City of Philadelphia (1985): enjoining police sweeps of Latinos in the Spring Garden neighborhood as a part of a Homicide Unit investigation.

    c. Arrington v. City of Philadelphia (1988): enjoining unconstitutional stops, detentions and searches of Black men during the "Center City Stalker" investigation.

262.    At the time of the investigation and prosecution of Mr. Lewis, the Philadelphia

Police Department had a practice, policy, or custom of:

    a. engaging in unlawful interrogations of witnesses, witness detentions and interrogations, planting of evidence, fabrication of witness and suspect statements, coercing false identifications through the use of unconstitutional identification procedures and failing to disclose exculpatory statements and evidence;

    b. failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;

    c. failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

    d. ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police interrogations, searches and arrests, coercion of witnesses, falsifying and fabricating evidence, coercion of false identifications through the use of constitutionally defective identification procedures and suppression of exculpatory evidence;

    e. failing to properly sanction or discipline Philadelphia Police Department officers, who are aware of and conceal or aid and abet violations of constitutional rights of individuals by other Philadelphia Police Department officers, thereby causing and encouraging Philadelphia Police, including the Defendant Detectives in this case, to violate the rights of citizens such as Mr. Lewis.

263.    At the time of the investigation and prosecution of Mr. Lewis, and for many years

before and thereafter, the Philadelphia Police Department and the City of Philadelphia has been

deliberately indifferent to the need to train, supervise and discipline police officers. The Internal

Affairs Division of the Philadelphia Police Department has failed to provide an internal

disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a. The Philadelphia Police Department's internal investigatory process was riddled with excessive and chronic delays in resolving disciplinary complaints;

b. The Philadelphia Police Department lacked consistent, rational and meaningful disciplinary and remedial actions;

c. The Philadelphia Police Department failed to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d. The Philadelphia Police Department's internal investigatory process fell below the accepted standards and practices and was arbitrary and inconsistent;

e. The Philadelphia Police Department discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to their number of violations;

f. The conduct of Internal Affairs investigations demonstrated that the Philadelphia Police Department internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g. A global analysis of Internal Affairs' investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h. The Philadelphia Police Department lacked an effective early warning system to identify, track and monitor "problem" officers;

i. Internal Affairs failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, and interviews that were conducted were below acceptable standards of police practices and failed to address key issues; and

j. Internal Affairs failed to acknowledge the disproportionate use of force by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

## DAMAGES

264.    The unlawful, intentional, willful, deliberately indifferent and reckless acts and omissions of the Defendant Detectives and the City of Philadelphia caused Mr. Lewis to be improperly arrested and subjected to the horrors of imprisonment, unfairly tried, wrongfully convicted and forced to serve over 21 years in prison for a crime he did not commit.

265.    As a direct result of Defendants' conduct and omissions, Mr. Lewis sustained injuries and damages, including loss of freedom for more than 21 years, loss of his youth, loss of his relationships with family members, including the deaths of his younger sister Tanisha

Thornton, his younger brother Tyree Franklin, and the death of his stepfather, Rodney Arrington, pain and suffering, mental anguish, emotional distress, countless indignities, degradation, permanent loss of natural psychological development, loss of life's pleasures, including the birth, early and developmental years of his now 21-year-old son, who was born 1 month after Terrance was wrongfully incarcerated, and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, voting, travel, enjoyment and freedom of speech and expression.

266.    As a direct result of Defendants' conduct and omissions, Mr. Lewis sustained economic injuries and damages, including loss of income from the employment he maintained before his wrongful arrest and incarceration and the loss of career opportunities.

267.    As a direct result of Defendants' conduct and omissions, Mr. Lewis sustained physical injuries, including physical pain and suffering, personal injuries, physical illness and inadequate medical care.

### COUNT ONE
### 42 U.S.C. § 1983
### Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

268.    Plaintiff incorporates paragraphs 1-265 as if they were set forth below.

269.    The Detective Defendants, acting individually and in concert with malice and knowing that probable cause did not exist to prosecute Mr. Lewis for Hulon Bernard Howard's robbery and murder, intentionally caused Mr. Lewis to be arrested, charged and prosecuted for those crimes, thereby violating Mr. Lewis' clearly established rights, under the Fourth and Fourteenth Amendments to the United States Constitution, to be free from prosecution absent probable cause.

270.    The Detective Defendants, acting individually and in concert, coerced and fabricated evidence and witness statements, coerced false identifications through the use of unconstitutional identification procedures and intentionally withheld and misrepresented exculpatory and inconsistent evidence, all of which resulted in an arrested and prosecution without probable cause.

271.    The Detective Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth and with deliberate indifference to Mr. Lewis' clearly established constitutional rights. No reasonable officer or detective in 1996, 1997, 1998 or 1999 would have believed this conduct was lawful.

272.    The prosecution fully terminated in Mr. Lewis' favor on May 21, 2019, when the Commonwealth of Pennsylvania announced it would not re-charge Mr. Lewis with the murder of Hulon Bernard Howard.

273.    The acts and omissions by the Defendant Detectives described in the preceding paragraphs were the direct and proximate cause of Mr. Lewis' injuries because Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction and incarceration of Mr. Lewis.

**COUNT TWO**
**42 U.S.C. § 1983**
**Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory Evidence, Coercing False Identifications Through the Use of Unconstitutional Identification Procedures and Deliberately Conducting an Investigation that Disregarded Constitutional Rights to Due Process and a Fair Trial**

274.    Plaintiff incorporates paragraphs 1-271 as if they were set forth below.

275.    The Defendant Detectives, acting individually and in concert, and within the scope of their employment with the Philadelphia Police Department, deprived Mr. Lewis of his clearly

established constitutional rights to due process of law and to a fair trial by fabricating inculpatory evidence, deliberately using coercion and suggestion to obtain inculpatory witness statements and false identifications, including without limitation: the false statements of Lena Laws and Denise Williams; false identifications of Mr. Lewis by Lena Laws and Denise Williams; false statements concerning Mr. Lewis "racking" a shotgun; false statements concerning Laws ability to observe the shooting, supplying Laws with information so she could correct her statement concerning where the Decedent was shot and providing photographs that caused Mr. Lewis' later in-court identifications.

276.    The Detective Defendants deprived Mr. Lewis of his right to a fair trial by withholding materially inconsistent exculpatory and impeachment evidence from prosecutors and defense, including, without limitation: information concerning the individuals witnesses identified as "Stink" within 6 days of the shooting; the contents of the witness unrecorded statements, recantations by the witnesses, the witnesses' criminal history; and the identity of the man identified by name as having been "Stink" and the fact that he had been arrested with a gun in West Philadelphia a few days after the murder.

277.    The Detective Defendants deprived Mr. Lewis of his right to a fair trial by deliberately conducting an investigation that disregarded Mr. Lewis' constitutional rights to due process and a fair trial, including but not limited to: failing to follow-up on and document investigative leads so that they could be appropriately documented and included in sworn affidavits that supported the arrest warrants and so that appropriate Brady disclosures could be made to Mr. Lewis during trial concerning investigative leads that were intentionally withheld from the prosecutor and defense or lost because they were never recorded.

278.    The Detective Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Lewis' clearly established constitutional rights. No reasonable officer in 1996, 1997, 1998 or 1999 would have believed that this conduct was lawful.

279.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Lewis' injuries. Defendants knew, or should have known, that their conduct would result in Mr. Lewis' wrongful arrest, prosecution, conviction and incarceration.

<u>**COUNT III**</u>
**42 U.S.C. § 1983**
**Civil Rights Conspiracy**

280.    Plaintiff incorporates paragraphs 1-277 as if they were set forth below.

281.    The Detective Defendants, acting within the scope of their employment and under the color of state law, agreed among themselves and with other individuals, to act in concert to deprive Mr. Lewis of his clearly established Fourth, Fifth, Sixth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, to be informed of the nature and cause of the accusation, to have compulsory process for obtaining witnesses in his favor, and to a fair trial.

282.    In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including but not limited to, the following:

    a.  suggesting, coercing and fabricating inculpatory evidence in the form of witness statements;
    b.  coercing and fabricating Lena Law's and Denise Williams witness statements and false identifications;
    c.  intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* and impeachment material during the pendency of the case;

    d.   wrongfully prosecuting Mr. Lewis while knowing that they lacked probable cause;

    e.   coercing false identifications through the use of unconstitutional identification procedures.

283.    Defendants acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Lewis' injuries. Defendants knew, or should have known, that their conduct would result in Mr. Lewis' wrongful arrest, prosecution, conviction and incarceration.

## COUNT IV
### 42 U.S.C. § 1983
### Failure to Intervene

284.    Plaintiff incorporates paragraphs 1-281 as if set forth below.

285.    By their conduct and under color of state law, the Defendant Detectives, acting within the scope of their employment with the Philadelphia Police Department, had opportunities to intervene on behalf of Mr. Lewis to prevent his false arrest, malicious prosecution, false imprisonment and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

286.    These Defendants' failures to intervene violated Mr. Lewis' clearly established constitutional right to be free from unreasonable searches and seizures and to not be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable officer in the years 1996, 1997, 1998 and 1999 would have believed that failing to intervene to prevent these Defendants from coercing and fabricating inculpatory evidence, using coercion and suggestion to obtain false witness statements and identifications, withholding material exculpatory and impeachment evidence, deliberately disregarding the constitutional rights of the accused when conducting an investigation and causing Mr. Lewis to be arrested and prosecuted without probable cause were lawful.

287.    Defendants acts and omissions, as described in this Complaint, were the direct and proximate cause of Mr. Lewis' injuries. Defendants knew, or should have known, that their conduct would result in Mr. Lewis' wrongful arrest, prosecution, conviction and imprisonment.

## COUNT V
42 U.S.C. § 1983
Municipal Liability Claim

288.    Plaintiff incorporates by reference paragraphs 1-282 as set forth fully below.

289.    The City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Mr. Lewis' wrongful arrest and conviction, and for many years preceding and following this investigation, a policy, practice or custom of unconstitutional misconduct in homicide and other criminal investigations, including in particular the withholding of exculpatory evidence; the use of coercive techniques in interviews and interrogations to obtain inculpatory statements and false identifications; the fabrication of incriminating statements from witnesses by coercion, suggestion and feeding of details about the crime; and the coercion of false identifications through the use of unconstitutional and suggestive identification procedures.

290.    Final policymakers for the City of Philadelphia had actual or constructive notice of these practice, policies and customs, but repeatedly failed to make any meaningful investigation into charges that Homicide detectives were using coercive techniques in interviews and interrogations to obtain inculpatory witness statements; withholding exculpatory evidence; fabricating inculpatory evidence, statements and identifications; fabricating incriminating statements from witnesses by coercion, suggestion and feeding details of the crime; and the

coercion of false identifications through the use of constitutionally defective and suggestive identification procedures, and despite being on notice of these unconstitutional practices, policies or customs, the City of Philadelphia failed to take appropriate remedial and disciplinary actions to curb this pattern of misconduct, and failed to train or supervise those who they knew or should have known were likely to perpetuate or continue the policies, practices and customs of unconstitutional police misconduct in Homicide investigations, as described in this Complaint.

### COUNT VI
**Malicious Prosecution pursuant to Pennsylvania Law**

291.    Plaintiff incorporates paragraphs 1-288 as if set forth below.

292.    The Detective Defendants initiated or continued proceedings against Mr. Lewis without probable cause, with malice or specific intent to injure, and the proceedings ultimately terminated in Mr. Lewis' favor on May 21, 2019, when the Resentencing Court granted Mr. Lewis a new trial and the Commonwealth *nolle prossed* Mr. Lewis' charges.

293.    As a result of this malicious prosecution, Mr. Lewis sustained the injuries and damages set forth in the Complaint.

**WHEREFORE**, Plaintiff Terrence Lewis prays for the following relief:

A.  that the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount determined at trial by a jury of Mr. Lewis' peers;

B.  that the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacities, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

C.  for a trial by jury;

**D.** for pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

**E.** for any and all relief to which Plaintiff may be entitled.

**ROSS FELLER CASEY, LLP**

By:

Robert Ross, Esquire (ID #47152)
Kevin Harden, Jr., Esquire (ID #310164)
One Liberty Place - Suite 3450
1650 Market Street
Philadelphia, PA 19103
Tel: 215-574-2000
*Attorneys for Plaintiff*

Dated: June 28, 2019